# SUPREME COURT.

## Fannie E. Musgrave agt. John H. Sherwood.

*Party wall — Adjacent owners may increase its hight— Equitable estoppel— Parol evidence— Covenant — Tenement-house.*

Either of the adjacent owners in a party wall may increase its hight when it can be done without injury to the adjoining building; and the wall is of sufficient strength to bear the addition.

*Brooks* agt. *Curtis* (50 *N. Y.*, 639) applied.

The injury to the adjoining building, which would prohibit the addition, is physical — to the building itself — it does not embrace remote consequences, not the necessary result of the addition to the wall.

The fact that the wall was finished when it was constituted, by deed, a "party wall," does not deprive an adjacent owner of his right to increase its hight.

Representations, to constitute an *equitable estoppel*, must be of an existing fact, condition or relation; promises or undertakings, prospective in their character and obligation, do not constitute an estoppel *"in pais."*

*White* agt. *Ashton* (51 *N. Y.*, 280), *Talmadge* agt. *East River Bank* (26 *id.*, 105) examined and applied.

Oral statements and promises, made by a vendor during negotiations for the sale and purchase of real estate, as to the use to which he would devote his remaining and adjoining property *in the future*, do not, in equity, estop him from devoting his property to purposes other than those specified. All previous negotiations and statements are merged in the contract and deed afterwards created; no condition being imposed at the time of their execution and delivery.

Covenants in the deeds under which the grantor held prohibited the erection of a "tenement-house," or building or business noxious or offensive to the neighboring inhabitants.

*Held,* that a "family hotel" was not a "tenement-house," and that its business was not a violation of the covenant.

"Tenement-house," within the meaning of the covenants, defined (*See same case,* 53 *How. Pr.*, 311).

*Special Term, January*, 1878.

*William A. Beach,* for plaintiff.

*A. J. Vanderpoel* and *H. B. Turner,* for defendant.

VAN VORST, *J.* — The wall, a line through the center of which forms the southerly boundary of the plaintiff's premises, is described, in the conveyance made to her by the defendant, as a "party wall." It gives mutual support to the adjacent buildings, and is, in fact, as it is called, a "party wall," and in law possesses its attributes. The building, standing on the land conveyed to plaintiff, was completely finished at the date of the conveyance, as was the defendant's adjacent building on the south, including the party wall. The conveyance was made to the plaintiff by deed bearing date the 15th day of December, 1873. The defendant was in the act of carrying up his adjoining buildings, on the south, two stories higher than the plaintiff's building, early in the summer of 1877, and, for this purpose, was about to build upon and increase the hight of the "party wall," when he was restrained by an injunction issued in this action. Questions of great interest are presented by the facts appearing on the trial, and in the arguments of the learned counsel appearing for the parties.

They are best disposed of, by determining first, what are the rights of the parties attached to, and growing out of the wall in question, considered as a "party wall," and if it shall appear that they include the right in the parties to add to its hight, whether the defendant is restrained by any agreement, covenant, or equitable consideration, of which this court can take cognizance, from exercising that right.

When any question has arisen in respect to a party wall, the courts have always been careful to respect and uphold, within legal limits, the rights of the adjacent owners therein.

A party wall is in no just sense to be deemed a legal

Musgrave agt. Sherwood.          -

incumbrance upon property.   The mutual easement of adjoining proprietors in a party wall, is a benefit, and not a burden to each of them.   It is a valuable appurtenant, which passes with the title to the property (*Hendrick* agt. *Stark*, 37 *N. Y.*, 106, PORTER, *J.*).

When the case of *Nash* agt. *Kemp* (49 *How. Pr. R.*, 522) was under consideration at special term, the right now claimed by defendant was, in part at least, incidentally examined, and the result was, in substance, reached, that as long as a party wall was capable of answering the purposes for which it was built, the owner of either part might underpin the foundation, sink it deeper as occasion might require, and increase its thickness within 'the limits of his own lot, or its length or hight, if he could do so without injury to the wall or the building on the adjoining lot.   He could, however, do nothing to its permanent injury, as a mutual support to the adjoining house.   An examination of the adjudged cases, there cited, seem to lead to such conclusions.   But the right to add to the hight of the wall, even within the limits of an owner's lot, was not involved in that action, nor was the right claimed by the defendant herein, determined by the cases therein cited.

*Brooks* agt. *Curtis* (50 *N. Y.*, 639) does, however, distinctly pass upon and determine such right.

RAPALLO, J., in delivering the opinion of a unanimous court, says : " We think that the right of either of the adjacent owners to increase the hight of a party wall, when it can be done without injury to the adjoining building, and the wall is clearly of sufficient strength to safely bear the addition, is necessarily included in the easement."

The question was directly involved, and 'this right should be regarded as definitely determined.

But the learned counsel for the plaintiff, in his able argument, would limit that case to a wall which was in an unfinished condition, when it was constituted a " party wall." He urges, that while that case sanctions the right to carry up

an *unfinished* party wall, it has no application to the wall under consideration, which was a *finished* structure, separating two completed houses, built for use as private residences, when the plaintiff's rights were acquired. It is true, that in *Brooks* agt. *Curtis,* when the plaintiff received his deed the wall was unfinished, but even in its incomplete condition, it was regarded as a party wall, which conferred the right to carry up the whole wall, although one-half thereof rested upon the land of the plaintiff. The wall was, however, afterwards completed, and had been in use for more than twenty years before the defendant commenced to add to its hight.

If the right reserved or created by the deed was only to carry up an unfinished wall, that right would have been exhausted when the structure had advanced to its then completion, and it could not have been added to afterwards, except through some newly-acquired right or license, and of this there was no claim.

*Brooks* agt. *Curtis* announces the general and unqualified doctrine, that a party wall may be increased in hight by either party interested therein, provided it can be done without detriment to the strength of the wall or the building of the adjoining owner.

There is no evidence that the proposed addition to the hight of the party wall under consideration will be to its detriment or to the injury of the adjoining building.

It is claimed, however, on the part of the plaintiff, that the proposed increased hight of the defendant's houses, and the use to which he means to apply them will constitute an injury to the plaintiff's property, and would constitute a breach of the defendant's promises and agreement with her.

The question then arises, should the defendant, for any reason appearing in the case, be abridged of his legal rights incident to his easement in the party wall in question, and be restrained from increasing its hight, in completing the addition to his adjoining buildings.

The plaintiff's property is valuable in itself and is highly esteemed by her as a residence for herself and family. The defendant's property being much more extensive, has the greater intrinsic value, and by improvement in the manner above indicated, he seeks to increase its value as a property to himself.

If the plaintiff would be injured by an unauthorized act of the defendant, he should be restrained from its performance.

But he should not be deprived of his right to improve and add to the value of his estate, and for this purpose to build upon the party wall in question, if his right to do so, can be upheld in law and equity.

The plaintiff's counsel claims "that the representations of defendant contemporaneous with his deed, create an estoppel *in pais* against his intended acts," and that "the covenants running with his title forbid the erection and business he proposes to make and pursue."

The plaintiff purchased her land and building from the defendant, paying therefor over $100,000, as a permanent residence, and has appropriately furnished and adorned it at large additional expense. It is well located on Fifth avenue, probably the finest street in the city.

Before the purchase was finally consummated, several interviews were had between the parties, and the negotiations ended in an agreement and in a written compact, the fifth of December, 1873.

The contract of sale and purchase was signed by the defendant and by the plaintiff's husband, who had conducted the negotiations for her. Afterward, and in execution of the contract, a deed to the plaintiff was made, executed and delivered by the defendant, on the 15th day of December, 1873.

Neither in the contract of the fifth of December, nor in the deed executed in pursuance of it, are there any restrictions imposed upon either of the parties, as to the use to which

Musgrave agt. Sherwood.

the property agreed to be, and actually conveyed, or the adjoining houses and lots of the defendant, shall be applied. As to whether the property was to be exclusively occupied as private residences or otherwise, the papers are silent. There is no covenant imposed upon, or assumed by either party, plaintiff or defendant, not to devote their property to business purposes. For all that the papers disclose, either party could appropriate his or her property to such uses, as they might deem for their individual advantage, without interference from the other.

But the plaintiff's husband has testified, that on one occasion pending the negotiation between himself, wife and defendant, while the three were inspecting the premises, the defendant "stated that we should be subject to no nuisances. That there were covenants in the deeds that provided against them, and that his remaining houses on the avenue would be occupied as first-class private dwellings, and that we should have no objectionable neighbors."

The conversation, as testified to, was either in the library or in the dining room, looking out on the property in the rear, the defendant's statement being made in response to something plaintiff had said in relation to the property in the rear.

Mrs. Musgrave, in effect and in substance, corroborates the testimony of her husband. There is some slight variation in their statements, but nothing more than would be likely to occur when two persons undertake, from recollection, to state what was said in an interview which had taken place several years before. Her evidence presents the defendant's statements, perhaps, in stronger words, that his buildings would "always be, first and last, private residences." But in substance the evidence of Mr. and Mrs. Musgrave is the same.

Upon her cross-examination plaintiff testified, that this conversation took place the *last of October, or first of November*. That the conversation was entirely volunteered on the

part of the defendant ; that in looking at the property in the rear, she simply made the remark, that she did not like the outlook, and hoped nothing disagreeable would be put there, when defendant volunteered the statement testified to. She had not, at that time, heard what the defendant asked for the house.

The time fixed by Mrs. Musgrave would place this conversation in an early interview between the parties, of which there were several, as the defendant was not in the country before the fifth of November, having returned from Europe on that day.

Both the plaintiff and her husband testify that except for these representations and statements they would not have bought the property.

The defendant, on the trial, denied that he made these statements, or any representations.

But if it be considered that he did make these statements, is he now concluded by them from adding to the hight of the "party wall," his object being to devote his property to the purposes of a family hotel ?

And was the plaintiff, and her husband, justified, in reason, in making the purchase upon oral statements in such manner made, in response to an inquiry, not about the defendant's property, but concerning the unimproved property to the north ?

The defendant's adjoining houses, although completed at the time, were not then and do not appear at any time since to have been occupied as private residences.

Some two or more years ago the defendant formed a connection between his two houses on the Fifth avenue, and then united them to a house he owned on Forty-fourth street, and converted the whole into a family hotel, known as the "Sherwood House," the basement of the house on the corner of Forty-fourth street, being occupied by the Fifth Avenue Bank.

The case does not disclose any protest, on the plaintiff's

part, against such changes in or use of the defendant's build-
ing.  Her effective opposition being first interposed, when
the defendant projected, and was about to add two°additional
stories to his houses to increase the capacity and profitable-
ness of his buildings as a family hotel.

The evidence shows some negotiations between the plain-
tiff's husband, before this action was commenced, and the
defendant, in regard to the leasing of the plaintiff's house
to the defendant, to be used by him in connection with his
improvements, but they failed to agree upon terms.

The question then arises, do these statements, claimed to
have been made, stand as representations, and are they effect-
ive to impress the defendant's remaining property on Fifth
avenue, with a negative easement in plaintiff's favor, by
force of which she can, in equity, restrain its appropriation to
other purposes than as private residences ? or are these state-
ments and representations merged, with all other previous
statements and negotiations, in the deed of the fifteenth
of December ?

The claim advanced by the defendant's counsel, in respect
to such easement, is not as a grantee or covenantee, nor could
it be, as the conveyance is silent, and there is no separate
writing creating such easement; but he urges that the repre-
sentations and promises of the defendant, through which the
plaintiff purchased, as is claimed, constitute in equity an
estoppel against his threatened acts, and prohibit him from
using the party wall for the purpose contemplated.  That the
estoppel forbids any alteration of the party wall in connection
with any improvement or change in the defendant's build-
ings, by which their character as first-class private residences
would be essentially altered, or they be used for any other
purpose injurious to the plaintiff.

The rule, doubtless, is, that when one, by his words or con-
duct, willfully causes another to believe the existence of a
certain state of things, and induces him to act on that belief,
so as to alter his own previous position, the former is con-

cluded by his statement, and will not be heard to the contrary (*Broom's Legal Maxims*, 286–290, *and cases cited*). But I think it will be found, upon an examination of the cases in which this doctrine is discussed, that the representation which produces such consequences must be of an existing fact, condition or relation, and is not applicable to promises or undertakings, prospective in their character and obligation. Such promises and undertakings are of the nature of contracts, and, if valid, and founded upon a good consideration, furnish adequate grounds for redress at law in case of breach, and, as contracts, can be affirmatively enforced. And if what the defendant stated on the occasion in question placed him under the obligation of a valid and binding contract, there would be no occasion to rest the plaintiff's case exclusively upon an equitable estoppel.

That the doctrine of equitable estoppel does not apply to a promise to be fulfilled in the future, is upheld by *White* agt. *Ashton* (51 *N. Y.*, 280). That case clearly recognizes the distinction between the admission of some act, or the doing of some act, and a promise to act. A carrier had given a bill of lading for the transportation of barley; the bill of lading was silent as to the route to be taken by the vessel, whether inside or outside. The plaintiff offered, upon the trial, to prove that the defendant agreed, by parol, before signing the bill, that he would transport the barley by the inside route. That upon such assurance he had acted in paying freight and insurance. The offer was excluded. The barley was taken by the outside route, and became wet and damaged. The exclusion of the evidence was approved in the appellate court, upon the ground that there "was a promise simply to do a given thing, to transfer merchandise by the inner route; there was no assertion of an existing fact, the truth of which the party sought to disprove. He failed to perform his verbal agreement. The cases are based upon the idea that the party asserts or admits the existence of some fact." Does not the principle of that decision meet the plaintiff's claim in this

Musgrave agt. Sherwood.

behalf? The representations and statements claimed to have been made were, in substance, that all the property was under restrictions; that there were covenants in the deeds against nuisances; that the defendant's remaining houses on the avenue *should* be occupied as first-class private residences; that they *should* have no objectionable neighbors. Of these representations, it is true some are of existing facts. Those in relation to restrictions and covenants in the deeds against nuisances, so called, are of that nature. The property was, in fact, held by the defendant, subject to covenants against objectionable erections thereon.

The allegations in the complaint in this behalf are, that, during the negotiation for the purchase, and just prior to the conveyance, the defendant represented and *promised* that her property should "in the future be protected, and free from any impairment in value and convenience and enjoyment as a private residence, from any erection or business pursuit in the vicinity thereof; and that the remaining buildings on Fifth avenue, then belonging to defendant, would and should be thereafter occupied only as first-class private residences; and that all the property so, as aforesaid, owned by defendant was protected from the erection or maintenance of nuisances thereon by covenants or conditions in the deeds through which defendant derived title." A form of the covenant in the deeds is in evidence. It does not declare that the property shall be used exclusively for private residences, but it prohibits the erection of any "stable, tenement-house, coal yard, slaughter-house," etc., or other building devoted to "trade, manufacturing business or calling noxious or offensive to the neighboring inhabitants."

The deeds containing this covenant were a matter of record, and open to the examination of the plaintiff and her husband, and the precise nature and extent of the restrictions could be readily determined by them; and as their attention, according to the evidence and the complaint, was seasonably called to the existence of covenants against nuisances in the

Musgrave agt. Sherwood.

deeds, by the defendant, it may in reason be supposed that they or their counsel were advised of their extent. The defendant could by no verbal statement make them different from what they actually were; he could neither enlarge or abridge them; and, in so far as the defendant spoke of the character of these covenants, and attempted to put a construction upon them as to what they included or excluded, he should not in equity be estopped, for the reason that it was a subject equally open to the plaintiff and her husband as it was to defendant himself. He having spoken of the covenants in the deeds, they were called upon to examine them, if they at all relied upon their existence in making the purchase. But the alleged promise of the defendant, that the plaintiff's property, " in the future," should be protected from impairment as a private residence, from any erection or business pursuits in the vicinity thereof, and that the defendant's remaining buildings would and should thereafter be occupied only as first-class private residences, would place him under a permanent obligation, for all future time, to devote his property to such purposes exclusively ; and such promise is, I think, within the principle of *White* agt. *Ashton* (*supra*), and is subject to the law of that case (*Springsten* agt. *Powers*, 3 *Robt.*, 483).

The case of *Tallmadge* agt. *East River Savings Bank* (26 *N. Y.*, 105), is cited by the plaintiff's counsel as supporting an equity in her favor against the defendant's acts; but, I think, it will be found, upon an examination of that case, that it is not, in reality, opposed to the principle recognized in *White* agt. *Ashton*. There Davis, the owner of all the land fronting on a street, made a map of the street, upon which it was shown to be seventy-six feet wide, eight feet having been added on each side. He called the street so widened St. Mark's place. This was before he sold any of the lots. He himself erected sixteen dwelling-houses on the street, in conformity with his map and plans, eight feet back from the original line of the street.

When he sold any lot he exhibited his map, and repre-

Musgrave agt. Sherwood.

sented to all who purchased, that the street was to remain as laid out. He sold certain of the lots to one Wilkes, showing him the plan and diagram and declaring his intention, that the buildings to be erected should be set back eight feet. Wilkes erected his buildings in pursuance with the plan, and afterwards conveyed away the property so built upon, and it finally came to the defendant. One of the conveyances through which the defendant acquired title, referred to a court yard of eight feet in width as included in the premises, and it was conveyed subject to all restrictions and covenants, if any existed, in relation to keeping the court yard properly open. The defendant bought, with notice, that it was claimed, that there were restrictions which would prevent it from acquiring right as purchaser of the lot, to build upon the eight feet described as a court yard.

The general term of the superior court, while holding that there was no dedication, decided that the original purchasers having agreed to, and *executed* a plan for the improvement of the place, they were bound to adhere to it, and the defendant purchasing with notice, took subject to the same equity. The court of appeals affirmed the judgment.

In that case, when the plaintiff purchased from Davis, he had already *executed* his plan by building and setting back his houses according to the plan and map which he exhibited, and in respect to which he made assurances. Good faith, doubtless, required that the plan should be carried out and maintained. The defendant having acquired title with notice, was especially bound to respect the arrangement. The arrangement had been in fact carried out by its grantor, who had built in conformity with the plan; others in the street·had done the same thing. There was a mutual equity between Davis and his grantors. He and they had acted in the execution of the plan. The representation made through the map was of an existing fact, as much so as it could be. The precise line was drawn and the buildings erected in pursuance of it, when the defendant, after the lapse

of many years of submission and acquiescence, sought to disturb it, and was properly restrained.

There is entirely absent from the plaintiff's claim in this action, what was a conspicous feature in *Talmadge* agt. *The East River Bank*, a reciprocal and mutual easement. The plaintiff was placed under no obligation to use her house as a private residence. There is no suggestion that she is under any engagement in this respect.

The defendant's promise with respect to the character of the occupancy of his houses, and of the neighborhood, if all that is claimed in that regard be conceded, had reference exclusively to the future. His houses were not then occupied and had never been. If the plaintiff purchased her house, and paid the large consideration therefor, relying upon the fulfillment by the defendant of such promise, so did the shipper in *White* agt. *Ashton*, deliver his barley, pay freight and insurance, on the faith of a promise to be fulfilled in the future by the carrier.

And if in the latter case, the carrier's promise could not be proved by parol, a bill of lading having been given, which was silent on the subject, so in this case, a contract and deed having been executed, delivered and accepted, without objection, all prior oral negotiation and colloquium should be regarded as merged, and there is nothing remaining upon which an equitable estoppel can reasonably rest (*Greenleaf on Evidence, vol.* 1, *secs.* 275, 276; *Langdon* agt. *Dowd,* 10 *Allen,* 433; 108 *Mass.,* 246; *Shapley* agt. *Abbott,* 42 *N. Y.,* 443).

The law of estoppel itself forbids any variation of the written agreement of the parties.

There is no allegation in the complaint or claim made that any thing was left out of the deed through fraud or mistake, nor that the deed is different from what it was expected or believed to be at the time it was executed and delivered. Its terms and legal effect are presumed to have been assented to. The rule in *law and equity* is the same under such circumstances. No mere oral stipulation between the parties ante-

Musgrave agt. Sherwood.

rior to or at the time of the execution and delivery of the deed can be given in evidence to control, qualify or enlarge the liability incurred through the deed. The plaintiff's husband and the defendant are both men of intelligence and large experience. It would be reasonable to conclude that the defendant, if he had believed that through his statements, made under the circumstances suggested, he had impressed a negative easement for all time on his remaining buildings on the avenue, of far greater value than the property sold to the plaintiff, by which he devoted them, notwithstanding the various changes then imminent and likely to occur, to the purpose of private residences exclusively, would have demanded from his grantee a corresponding stipulation on her part, with respect to her property, and that both would have felt the propriety of incorporating in the deed, or some contemporaneous writing, proper covenants or agreements in respect thereto. The representations of the defendant are not claimed to have been made after the deed was drawn and before its execution and delivery, when it might have been inconvenient, perhaps, to insert the stipulation. In fact, they are not claimed to have been reiterated at that time, or in any manner then referred to.

In the argument of the learned counsel for the plaintiff, it is claimed that they were made *contemporaneous* with the deed. But the plaintiff testifies they were made the last of October or first of November, and her husband says they were made before the written contract was made and executed.

In *Cozzens* agt. *Stevenson* (5 *S. & R.*, 421) it was held essential that a stipulation, set up as modifying a contract, should be so far *contemporaneous* with its execution as to rebut the presumption that it was intentionally discarded by the parties, or merged in the agreement as finally made (*Russ* agt. *The Life Ins. Co.*, 23 *N. Y.*, 516).

In case of accident, fraud or mistake, such rule, however, would clearly not apply (*Allen* agt. *Spin*, 8 *Allen*, 412; *Howard* agt. *Thomas*, 12 *Ohio*, 201).

Musgrave agt. Sherwood.

The principle that the contents of a deed may not be altered, added to, or varied by oral evidence, is of very great moment, and its propriety has been sanctioned by a long current of decisions, and it appears to me should not yield in this instance, to let in oral statements and promises which appear to have been casually, and without premeditation volunteered, on an occasion, while the parties were inspecting the premises, and which do not appear to have been made under circumstances absolutely to justify the conclusion that the defendant intended to place himself under a lasting obligation in respect thereto. Undertakings of so important a character, and *affecting lands*, should assume a permanent form, about which there would be no room for dispute or misunderstanding. This, I apprehend, is a reasonable requirement (*Parley* agt. *Farrell*, 51 *How. Prac. R.*, 497). At this time the Windsor hotel, a large and expensive building, covered the entire front of the block on the avenue between Forty-sixth and Forty-seventh streets. There were unmistakable indications that similar changes were likely to occur in other places contiguous ; and other large hotels have been since erected in the adjacent neighborhood ; and its proximity to the grand depot of the New York Central and Hudson River, Harlem, and New York and New Haven Railroad, might reasonably suggest that the requirements of business must soon disturb that quiet, in the immediate neighborhood of the defendant's property, so essential to the true enjoyment of private residences. Such changes in large cities are ever recurring.

Fifth avenue has itself yielded greatly to the demands of business interests. Hotels have been established in various places north and south of the plaintiff's dwelling ; and one of the witnesses testifies that between Twenty-ninth and Forty-second streets, one-fourth of the residences on the avenue have become boarding-houses, and that the number is increasing. Not far from the plaintiff's house is a livery stable, a butcher's shop, a saloon, a garment cleaning store

and a florist's establishment, and the property on the block, north of her premises on the avenue, has not been devoted to private residences since she acquired her title. It was unpromising in this respect when she purchased, and its character has not since changed. And although the intentions and hopes of the plaintiff may be disappointed, I do not think that the defendant should be restrained from converting his property to the uses contemplated by him, in the absence of effective covenants and agreements not to do so.

The defendant is, doubtless, under a moral duty to meet fully every representation made, or assurance given, in respect to his property, whatever loss it may entail. The standard of obligation between man and man cannot be placed on too high a plane. But justice and equity is administered, when an appeal to its tribunal is made, upon fixed principles and well-determined rules. They cannot be changed to meet the exigency of a given case, as a lax administration of these well-established rules and principles would, in the end, give rise to doubts and uncertainty, and let in greater evils than the one attempted to be remedied.

As already stated, the defendant denies, explicitly, that he made any of the statements claimed to have been made by him, either in respect to the restrictions on, or future use of, his own property. He states that he had two or more interviews with the plaintiff's husband, but none with him and his wife, before the contract was signed, and he places these interviews in the latter part of November or first of December. He gives the nature and character of these interviews; he states their difference in views in respect to the price to be paid for the house and grounds, and certain demands made by the plaintiff's husband in regard to the closing of windows in the rear of one of his houses, which he declined. The terms were agreed upon, and the transaction was finally closed at the office of the plaintiff's husband, in Broad street. The defendant's testimony on the subject is as follows: "I went to his office, in Broad street, offered to sell him the house for

$120,000 ; he then offered me $110,000 for the house ; I told him I would not accept the price then, I would think of it, and let him know the next morning ; I then went to his office the next morning, accepted his proposition, sat down in his office, took up a pen and wrote the contract; we both sat together framing the substance of the contract until it was satisfactory to both of us ; I then gave the contract to Mr. Musgrave ; he handed it to a clerk of his in the office, who copied it; we then executed the two contracts, he taking the one I had written out, I taking the one that his clerk, or some one in his office, had written out." I do not understand that there is any controversy about the correctness of defendant's testimony as to what transpired at the making of the contract, in the office in Broad street. It is not claimed, on the plaintiff's part, that the subject of restriction or the future use of the defendant's remaining property were then, in any manner, alluded to, or that any promises were made or reiterated at that time. No conditions on the subject were imposed or offered.

The parties stand before the court equally entitled to credit, and the question must be determined by the preponderance of evidence. It is a question of recollection and memory. One may forget what has occurred, without any impairment of his truthfulness, but no one can recall what never happened. It may, therefore, be considered that, in the early stages of the negotiation, defendant did make the statements, the substance of which has been above given, but. they must be regarded as wholly immaterial ; for if the statements were regarded by the parties as material, if they were so esteemed by the plaintiff or her husband, the defendant should, then and there, before the contract was signed, have been informed of that fact. He could not absolutely know that the plaintiff was purchasing upon some statements made by him in an early stage of the negotiation, when his attention was called, not to the use of his own property, but to the condition of adjoining lots, and which statement he may have

forgotten when the contract was finally made; or have supposed not insisted upon as material, unless he was called upon to give an absolute assurance as to the manner in which his own property was in the future to be used. Had a formal agreement or specific promise been then demanded of him, as a condition of purchase and sale, the defendant might have concluded not to sell upon such conditions, or, at least, he might have demanded a similar promise or agreement from his grantee. In *Morgan* agt. *Griffiths* (6 *L. R. Ex.*, 70), before the lease was given, the lessee told the lessor that he would not sign it unless the lessor promised to destroy the rabbits on the farm. The lessor promised. The lease was afterwards granted, but it did not mention the destruction of the rabbits; but in that case the oral agreement was understandingly made by the lessor as an unyielding condition, imposed by the tenant, to his signing the lease. Also, where writings are incomplete on their face, and it is clear that a part rested in parol, then suppletory evidence can be given to supply the deficiency (*Potter* agt. *Hopkins*, 25 *Wend.*, 417). But upon the face of the contract, and deed given in execution of it, there is nothing wanting to a completed transaction ; and, upon the principles above announced, they are, in law and equity, presumed fully to express all the engagements of the parties; and, in the absence of any writing contemporaneous with the deed, and of any evidence of a refusal to accept the deed, or to consummate the purchase, unless upon the condition of a promise made by the grantee as to the future use of his property, and it appears that, when the contract was in the end made, there was no reference or allusion by either party to any prior representation or statement of the defendant theretofore made, and no representation being then made or promise given, it may be well concluded that no such statements were deemed by either party as of the substance of the transaction ; that they were either waived or not insisted upon, and that by them the defendant ought not, in equity, to be concluded.

The plaintiff's counsel, however, urges that the defendant's representations did not relate directly to the property conveyed by the deed, that they were not pertinent to it; but if the purchase was made in reliance upon them, it certainly would not have been improper to incorporate in the deed all the defendant's promises and undertakings claimed to be a part of the transaction. The deed does contain covenants and agreements on the part of the defendant, and is presumed to contain all his engagements *founded upon the consideration therein expressed;* but that they were not pertinent to the deed does not meet the objection that no memorandum in writing was made, of any description, nor was any oral promise or statement made, when the deed was delivered, to uphold an equitable estoppel.

A question yet remains to be considered as to whether the contemplated changes in the defendant's houses, and their devotion to the purposes of a hotel, constitute a violation of the covenants in the deeds through which he became seized of the property.

Witnesses upon the trial speak of the defendant's houses as heretofore used and as contemplated to be used, as an "apartment-house" or "French flats," as a hotel; "a family hotel," one witness calls it a "boarding-house." Mr. Musgrave only speaks of it as a "tenement-house." He says, "the changes give it the appearance of a large apartment hotel, tenement-house character, whatever you chose to call it."

But in adding to their hight the defendant has not changed the general style or appearance of his buildings. They are externally the same houses, with two added stories of the same material and architecture which belonged to them before the addition.

William H. Guion, a witness for the plaintiff, says, that from the added stories, they have not lost the external appearance of private residences, although higher than private residences are built.

Musgrave agt. Sherwood.

There has been no evidence adduced as to what use constitutes a building a "*tenement-house.*"

I am inclined to the opinion, that the defendant's houses best answer the designation of a "family hotel." Together they are known as the "Sherwood house." The house is not, however, designed for the accommodation of transient guests or casual boarders. Rooms in suits or singly, on the different floors, are taken by families or individuals for some period. The cooking for all the guests or residents of the hotel is done by the proprietor on the premises, the house having been provided with all the means and appliances for the purpose; no cooking or laundry work is allowed in the rooms of the guests. Occupants of the rooms take their meals in the dining room of the hotel or in their own apartments, according to their arrangements with the proprietor, who supplies all the tables.

Does a house so managed, occupied and maintained violate the covenants in the deeds to the defendants?

And here we encounter an objection interposed by the learned counsel for the defendant, that the covenants in the defendant's deeds do not inure to the advantage of the plaintiff. The argument being, that as between the plaintiff and the defendant, the covenants were extinguished, because not included in the plaintiff's deed. It is true that the defendant has not placed the plaintiff under any of the covenants contained in the deeds to himself, and it may be, that as between them, he did not mean to perpetuate these covenants. But assuming that the covenants are in force, and that the plaintiff may avail herself of them, as against her grantor, and through them, limit the defendant as to the use of his own lands, yet, I do not think the defendant's houses violate the covenants.

The covenants interdict, by name, the erection of buildings devoted to specific business and trades. A hotel, or apartment-house, is not among them. A "*tenement-house*" is forbidden. I am referred to no legal definition of the

word "tenement-house," as used in the covenant, and. I am not aware that there is any. As already stated, the defendant's houses, as united and conducted, are. not in terms, and according to any accepted meaning or understanding of the word, proved to be such, and unless the word be the equivalent for a *hotel* or *apartment-house*, a breach of the covenant in this respect has not been proven, and is not threatened.

The burden is on the plaintiff to establish that the defendant's houses, as conducted, and proposed to be, come *within the terms* or meaning of the covenant. As the covenant, as construed by the plaintiff, works a *restraint of what would otherwise be a lawful use* of the defendant's houses and lands *to be restrained, the breach* made or threatened should be clearly and satisfactorily established.

From the connection in. which the word *" tenement house "* appears in the covenant, with other forbidden buildings and business, it would imply that about such premises there is something noxious or offensive. The word "tenement," in its ordinary acceptation, is applied to houses and other buildings, yet, in its proper legal sense, signifies every thing that may be holden. It not only includes lands, but rents, and other interests.

Tenemental-land, means that part of a manor which is granted to tenants, as distinguished from the demesne lands (2 *Black. Com.*, 90).

But it is not reasonable to conclude that the covenant absolutely requires that the owner of the land should himself occupy the dwelling-house which he may erect thereon, and that he is forbidden to erect a house which he designs to let to a tenant, or that such letting would be a breach of this covenant.

The word "tenement-house" has, however, a common or conventional meaning. Webster, in his definitions of "tenement," among others, says it is "often, in modern usage, an inferior dwelling-house rented to poor persons, or a dwelling erected for the purpose of being rented ; called, also, tene-

ment-house." I do not think that the defendant's hotel answers, in any true sense, either definition. I do not think it within the true meaning of the covenant to hold that it forbids the erection of a house which might or was designed to be rented. There is nothing permanently offensive about a rented dwelling-house. There may be about houses erected for, and occupied by, many families as tenants, with all the appliances for house-keeping on separate floors. Such houses may become crowded by families and occupants whose mode of living, and conduct in the use of the premises, and in their egress and exit therefrom, may become offensive to the neighborhood. In large cities it must needs be that buildings will be erected for the accommodation, under one roof, of families of small means, as separate and distinct tenants, of different parts of the same house. The tendency to the over-crowding of such houses, and the disregard of cleanliness on the part of occupants, may well constitute such buildings and their use an annoyance to the occupants of private houses adjacent.

The existence of large numbers of such houses in the city of New York has called for legislative action for their regulation.

Chapter 908 of the Laws of 1867, is an act for the regulation of "tenement" and "lodging-houses" in the cities of New York and Brooklyn.

Section 17 of the act defines a "tenement-house" for the purposes of the act.

"A tenement-house shall be taken to mean and include every house, building or portion thereof, which is rented, leased, let or hired out to be occupied, or is occupied as the home or residence of more than three families living independently of another, and doing their cooking upon the premises, or by more than two families upon a floor so living and cooking, but having a common right in the halls, stairways, yards, &c.

Such houses are made by this act the subjects of specific

Musgrave agt. Sherwood.

municipal oversight, and are measurably under the super-
vision of the board of health.

I think that the covenant in question is directed against
the erection and maintenance of buildings of the character
of those mentioned in the act.

It has no reference to a hotel of the character of the
defendant, which is, in no just sense noxious or offensive.

There was evidence adduced on the trial as to the effect of
a hotel upon an adjoining private residence, in so far as its
enjoyment and value are concerned.

There are evidently two opinions upon these subjects.
While some witnesses discover great objections to living in
a house adjoining, or in the immediate neighborhood of a
hotel, others see no disadvantage in such proximity. Some
of the witnesses were of the opinion that a hotel depreciates
the value of an adjoining house as a private residence, others
regard the devotion of the defendant's houses to the pur-
poses of a hotel, as a ground of advantage, in the prospective
advance in values of adjoining houses and lots for business
and commercial purposes.

But I am of opinion that this line of inquiry is foreign to
the interpretation of the covenant, and affords no proper
criterion for its construction. Unless the maintenance of a
hotel is forbidden by the letter or true spirit of the cove-
nant, effects of the character indicated cannot control, so long
as they do not show the buildings or the business to be nox-
ious or offensive. The defendant's houses have been well,
and in an orderly manner, kept, as its title of a family hotel
and the character of its guests and occupants would indicate.
The plaintiff testifies that she has been annoyed by the play-
ing of pianos and other musical instruments in the adjoining
houses, and that since the defendant has carried up his
additional stories, the air and light have been decreased.
The latter results have been produced in part by the addi-
tions to the defendant's houses on Forty-fourth street.

The party wall is twenty inches thick up to the first story,

and above that to the roof sixteen inches.   Such a wall should afford reasonable protection against movements of orderly persons in an adjoining house.   Those results are not, however, the consequences of an addition to the hight of the party wall.   They cannot be characterized as a nuisance, nor do they exist to a degree to render the defendant's houses "noxious or offensive to the neighboring inhabitants" within the meaning of the covenant.   I should greatly hesitate under the evidence to pronounce them such.

The case of *Brooks* agt. *Curtis* (*supra*), decided that the right of either adjacent owner to increase the hight of the party wall exists when it can be done without injury "to the adjoining building," and that the party making it does it at his peril.

The injury alluded to, I apprehend, is physical.   To the building itself, the direct result of the addition to the wall and has no reference to remote consequences.

The interference with air and light, of which complaint is made, even if within the injuries contemplated by the decision above referred to, cannot be said to arise from the party wall, as it has not yet been raised.   I fail to see how the completion of the wall up to the proposed hight, can in any way aggravate the results.   Such consequences, in a greater or less degree, attend improvements and additions to city houses.

I have considered the various propositions of the plaintiff's counsel, and the grounds upon which it has been most earnestly argued by him, that the defendant should be restrained from building upon, and adding to the hight of, the party wall, and from perfecting his improvements and maintaining his hotel — and have reached conclusions adverse to the plaintiff's right to such redress, or to equitable interference by injunction.   The plaintiff's claims have been argued by her counsel with learning and great ability, but I am unable, after much reflection, to adopt his views as expressed in his

Musgrave agt. Sherwood.

propositions, or to yield to his arguments, although almost persuasive.

I have carefully read and considered the opinion of justice WESTBROOK, delivered when he made the order continuing the injunction, on the interlocutory motion, and find myself brought, upon a consideration of the whole case, as it appeared on the trial of the action, to conclusions different from those reached by that learned and experienced judge.

It is with no little hesitation that I am led to a result different from that reached by him.

But his opinion was delivered at chambers, when he was under a great pressure of business, and when a speedy determination was so much needed. He at once addressed himself to the disposition of the motion under circumstances unfavorable to a full consideration.

The fact, however, that my conclusions differ so materially from those reached by justice WESTBROOK, may well cause me to distrust the correctness of my own judgment. But I could not do otherwise than follow my own convictions, upon consideration, as to the law and equity of the case, upon the facts appearing before me upon the trial of the action.

The conclusion is that the complaint must be dismissed, but, I think, without costs.